No. 39,765

PHIL H. ADRIAN and DR. JOHN W. HERTZLER, a Co-partnership, doing business under the trade name of Twin Oak Farm, *Appellees*, v. DR. R. F. ELMER, doing business under the trade name of Bob White Hereford Farms, *Appellant*.

(284 P. 2d 599)

Opinion filed June 11, 1955.

*Harold Bolton*, of Abilene, argued the cause, and was on the briefs for the appellant.

*Paul H. Royer*, of Abilene, argued the cause, and *John E. Wheeler*, of Marion, and *Robert H. Royer*, of Abilene, were with him on the briefs for the appellees.

The opinion of the court was delivered by

WERTZ, J.: This was an action to recover the purchase price of a registered Hereford bull, and damages resulting from an alleged breach of an express warranty.

Appellees Phil H. Adrian and John W. Hertzler, hereinafter referred to as plaintiffs, were a partnership doing business as Twin Oak Farm. The appellant Dr. R. F. Elmer, a resident of Denver, Colorado, hereinafter referred to as defendant, was doing business as Bob White Hereford Farms in Dickinson County. His manager in charge of the Hereford farms was Kenneth Skelley.

Plaintiffs' petition alleged the bull was purchased for the express and only purpose of covering registered cows and getting calves therefrom; that defendant knew this was the purpose for which the bull was purchased; that defendant through his agent, Kenneth Skelley, represented, promised and warranted to plaintiffs that the bull was a sound, healthy bull, perfect in all parts, and that he was a one-hundred percent breeder; that he had settled thirty females out of thirty-one and was a sure calf getter; that plaintiffs, relying on the representations, purchased the bull. It was further alleged that at the time the representations were made, the bull was almost entirely barren, impotent and unfit for the purposes for which he was purchased, and valueless as a breeder and calf getter; that plaintiffs suffered loss in not having twenty-six cows settled and obtaining calves, and sought recovery of the purchase price of the bull and damages for loss of time, feed and pasture.

Defendant's answer admitted the sale of the bull but denied all other material allegations of the petition. Defendant specifically denied that any warranty was made as to soundness or physical fitness of the bull, and alleged at the time of the sale the bull was in fact healthy, physically fit and that any deterioration in his health or soundness resulted from causes outside defendant's control. Defendant cross-petitioned for $250 for care and feed to the bull after he was returned to defendant by plaintiffs. Plaintiffs replied by general denial. On these issues the case was tried to a jury. From a verdict in favor of the plaintiffs, defendant appeals and asserts as ground for reversal, error of the trial court in (1) overruling motion for a new trial, (2) overruling demurrer to plaintiffs' evidence, (3) admission of certain evidence, and (4) that the judgment is contrary to the evidence.

While the testimony in the record is voluminous, we will briefly narrate only such part as is necessary to determine the issues involved. Plaintiffs were in need of a registered bull. Plaintiff Adrian in March, 1951 drove to the defendant's farm for the purpose of

seeing Kenneth Skelley, the manager in charge, and told him he needed a bull to breed fifty cows. Mr. Skelley was the active manager of defendant's farm, and authorized to conduct all the business of the farm such as selling livestock, and was interested in the sale of cattle, receiving a salary, and a commission of ten percent of the gross sales from the livestock. Adrian stated to Skelley that they were in need of a good herd bull; that they had fifty head of registered cows and heifers of breeding age on their farm, and they planned on hand breeding twenty head of them, and putting the bull in the pasture with the other thirty head, and asked Mr. Skelley whether their registered bull would be suitable for the purpose. Skelley advised Adrian that he knew this bull was a good breeder as the bull had settled thirty out of thirty-one heifers bred on their farm, and that it could do a good job in breeding the fifty head owned by plaintiffs, and that the bull could be expected to work around fifty cows. He further stated, "You fellows don't have anything to worry about; this bull is a good settler; a bull like this is guaranteed to be a good breeder," and further stated the bull was one-hundred percent sound and a one-hundred percent good breeding bull. Skelley testified as to a conversation with Adrian:

"A. Mr. Adrian said, 'You are selling the bull as a breeder?' and I said, 'Yes, we are selling him as a breeder, as we bought him as a breeder; we bought him at the Denver sale.' After all, that's the purpose of our cattle, to sell them as breeders, and that's how he was sold to Mr. Adrian.

"Q. Now, your words were, 'as a breeder'?

"A. Yes, 'as a breeder'; we sold him as a breeder; there was no doubt—"

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Well, Mr. Skelley, whatever you told Mr. Adrian, you expected him to believe you, didn't you? A. I expected him to, yes."

Adrian testified he relied upon the statements and representations made by Skelley and purchased the bull. The evidence disclosed that the bull produced only one calf out of twenty hand breedings from March until May, 1951. From May until October, 1951 the bull was put among a herd of fifty cows which included the twenty which had been hand bred, and produced only a total of twelve calves. Skelley further testified that they got only two calves out of thirty-one cows they thought to be settled.

The evidence further disclosed that an examination at the Kansas State College, made about one year after the sale, found the bull to be deficient in live spermatozoa, and those that were alive had very

little or poor motility, and that the bull was not a good breeder. There was evidence that an average breeding bull produces a seventy percent calf crop or better, and a good breeder, ninety percent or better. The bull was returned to defendant's farm in January, 1952. Plaintiffs' cows were not at fault as they were later bred to other bulls and a calf was born to each cow.

Defendant contends he did not expressly warrant the bull to be a good breeder and sure calf getter; that the statements of Skelley were mere expressions of opinion, and that his demurrer to plaintiffs' evidence should have been sustained. With this contention, we cannot agree.

It is the general rule of law that a warranty is express when the seller makes an affirmation with respect to the article to be sold, pending the agreement of sale, upon which it is intended that the buyer shall rely in making the purchase. No technical or particular words need be used to constitute an express warranty, yet whatever words are used must substantially mean the seller promises or undertakes to insure that certain facts are, or shall be, as he represents them. (*Topeka Mill & Elevator Co. v. Triplett*, 168 Kan. 428, 434, 213 P. 2d 964; *Lumber Co. v. Kelley*, 117 Kan. 285, 231 Pac. 71; 77 C. J. S., Sales, 1115, § 301.)

In a somewhat similar case of *Eden v. Vloedman*, 202 Okla. 462, 463, 214 P. 2d 930, the general rule is well stated:

". . . that to constitute an express warranty, no particular language is necessary. It is not required that it shall be in writing or be made in specific terms; and, it is not necessary that the word 'warrant' or 'warranty' shall be used. Any direct and positive affirmation of a matter of fact, as distinguished from a mere matter of opinion or judgment, made by the seller during the negotiations and as a part of the contract, designed or intended by the seller to induce the purchaser to buy, and actually relied upon by the purchaser in making the purchase, will be deemed to be a warranty."

Representations as to the quality or fitness of an animal for breeding purposes ordinarily constitute an express warranty of such, and a warranty of an animal for siring purposes is a present warranty that with proper care the purposes will be served. (77 C. J. S., Sales, 1188, § 330 [3].) An express warranty of soundness of an animal may arise by representation by the seller made to induce a sale and which are relied on by the buyer, and such warranty, once made, need not be renewed in order to be effective. (77 C. J. S., Sales, 1187, § 330 [2].) If the facts or affirmations relied upon to prove an express warranty rest wholly in parol, it is the province of

the jury to determine whether they amount to an express warranty. (*Topeka Mill & Elevator Co. v. Triplett,* supra; 46 Am. Jur., Sales, 507, § 326.)

Applying the established law to the mentioned facts we conclude that the representations made by the defendant, through Skelley, amounted to more than mere statements of opinion. They were, in fact, an express warranty of the fitness of the bull for breeding purposes; that he was healthy and capable of procreation, and that he would reproduce as contemplated by plaintiffs and represented by defendant. There was ample evidence as to the warranty and the breach thereof, and the trial court did not err in overruling defendant's demurrer to plaintiffs' evidence.

Defendant contends that Skelley was not authorized by him to make the warranty regarding the bull. As related, Skelley was the manager of defendant's farm in charge of his herd. He was authorized, and sold cattle for defendant, received a monthly salary, and a commission of ten percent of all cattle sold. It is undisputed that defendant received and kept the consideration for the bull sold to plaintiffs by Skelley, and subsequently advised plaintiff Adrian by letter, stating in part: "This bull was a breeder when sold to you." While there was ample evidence in the record to support the fact that Skelley was the authorized agent of defendant at the time the representations were made in accordance with the instructions given by the court, to which there were no objections, we need not discuss that phase in view of the well established principle of law that when a principal, expressly or impliedly, elects to ratify an unauthorized act, he must, so far as it is entire, ratify the whole of it, and he will not be permitted to accept its benefits and reject its burdens. Ratification in agency is an adoption or confirmation by one person of an act performed on his behalf by another without authority. The substance of the doctrine is confirmation after conduct, amounting to a substitute for prior authority. The ratification by the principal of an unauthorized act of his agent is equivalent to an original grant of authority. Upon acquiring knowledge of the agent's unauthorized act, the principal should promptly repudiate the act. Otherwise, it will be presumed he has ratified and affirmed it. (*Will v. Hughes,* 172 Kan. 45, 53, 54, 238 P. 2d 478; *Flitch v. Boyle,* 149 Kan. 834, 89 P. 2d 909; *Watson v. Woodruff,* 154 Kan. 61, 114 P. 2d 864; *Aultman v. Knoll,* 71 Kan. 109, 79 Pac. 1074; *Isaacs v. Motor Co.,* 108 Kan. 17, 193 Pac. 1081;

2 C. J. S., Agency, § 34[a]; 2 Am. Jur., Agency, § 232.) The defendant, having received the benefits of the sale by his acceptance and retention of the consideration, cannot now reject the burdens incident thereto.

It is further contended that it was error for the trial court to allow Dr. Frank, Kansas State College, to testify regarding the examination of the bull approximately one year after the sale. At plaintiffs' request, he examined the bull and found him to be deficient in live spermatozoa, and those that were alive had very little or poor motility, and that the bull was not a good breeder. The gist of defendant's objection to this evidence was that it was too remote. The admissibility of this evidence was a matter to be determined by the trial court, and the weight of the testimony was for the jury. We cannot say that the court erred in its admission.

Defendant contends that plaintiffs' recovery should have been limited solely to the purchase price of the bull, plus its feed and care. This question needs little consideration. The issue of damages was joined by the pleadings and expressly covered by the court's instructions to the jury, to which there were no objections, and it was not urged on motion for new trial that the instructions were erroneous. Under such circumstances, the rule in this jurisdiction is that they became the law of the case and are not now a subject for appellate review. (*Montague v. Burgerhoff*, 152 Kan. 124, 128, 102 P. 2d 1031; *Haney v. Canfield*, 152 Kan. 597, 601, 106 P. 2d 662; *Ehrhart v. Spencer*, 175 Kan. 227, 234, 263 P. 2d 246.)

We have carefully examined the record and adhered to the well-established rule of this court that in actions at law where disputed questions of fact are submitted to the jury, its verdict will not be disturbed on appeal where there is any evidence tending to support it. Therefore, the judgment must be affirmed.

It is so ordered.