No. 59,325

JAMES A. CORRAL, *Appellant,* v. ROLLINS PROTECTIVE SERVICES COMPANY, d/b/a Rollins Protective Services, Inc., a subsidiary of Corporation of Rollins, Inc., *Appellee.*

(732 P.2d 1260)

Opinion filed February 20, 1987.

*Paul Hasty, Jr.*, of Wallace, Saunders, Austin, Brown & Enochs, Chtd., of Overland Park, argued the cause and *Jeffrey L. Lauersdorf*, of the same firm, was with him on the briefs for appellant.

*Jeffrey S. Nelson*, of Shook, Hardy & Bacon, of Overland Park, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

HOLMES, J.: James A. Corral, plaintiff below in an action to recover damages for a fire loss suffered at his residence, appeals from orders of summary judgment and partial summary judgment rendered in favor of the defendant, Rollins Protective Services Co. (Rollins). The trial court determined that its orders constituted a final judgment under K.S.A. 60-254(b) and Corral appeals.

Rollins had installed and agreed to service a fire and burglary alarm system in the Corral home. A fire occurred, the alarm system failed to function, and Corral sustained substantial damage. Suit was filed against Rollins for the amount of the fire loss asserting five separate causes of action based upon (1) negligence, (2) strict liability, (3) breach of implied warranty, (4) breach of express warranty, and (5) violation of the Kansas Consumer Protection Act (KCPA). In an amended petition, an additional cause of action was alleged for violation of the federal

Magnuson-Moss Warranty Act. Upon motions filed by Rollins, the trial court granted partial summary judgment on the negligence and strict liability claims limiting any recovery thereunder to $250.00 and granted summary judgment in full as to the remaining claims.

A motion for summary judgment is to be sustained only where the record conclusively shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Williams v. Community Drive-in Theater, Inc.,* 214 Kan. 359, 520 P.2d 1296 (1974). However, only disputed "material" facts will preclude summary judgment. If a disputed fact, however resolved, could not affect the judgment, it does not present a genuine issue of a material fact. *Secrist v. Turley,* 196 Kan. 572, 575, 412 P.2d 976 (1966). In the case at bar, it does not appear that Corral contests the facts as contained in the trial court's decision, but instead takes issue only with the trial judge's application of the law.

On August 28, 1978, Corral entered into a one-page contract with Rollins entitled "Installation-Service Agreement." Under the terms of the agreement Rollins was to install and service a burglary/fire alarm system at plaintiff's residence in Stanley, Kansas. Corral agreed to pay $1,760 for installation and then $35.20 per month for servicing. The contract was for an initial three-year period and thereafter converted to a yearly term until cancellation by one of the parties. Three provisions of the agreement are relevant to this action.

"The Rollins Protective System shall remain personal property and title thereto shall continue in Rollins. Customer covenants and agrees not to mortgage, sell, pledge or permit the damage or destruction of the System; to use the System in a proper manner; and upon termination of this Agreement to immediately return the System to Rollins in the same condition as when received, reasonable wear, tear and depreciation resulting from proper use thereof alone excepted. Rollins hereby waives all lien rights on the Customer's property described in Exhibit 'A'.

. . . .

"It is further agreed that Rollins is not an insurer of the Customer's property and that all charges and fees herein provided for are based solely on the cost of installation, service of the System and scope of liability hereinafter set forth and are unrelated to the value of the Customer's property or the property of others located on the Customer's premises.

"The parties agree that if loss or damage should result from the failure of

performance or operation or from defective performance or operation or from improper installation or servicing of the System, that Rollins' liability, if any, for the loss or damage thus sustained shall be limited to a sum equal to ten (10%) per cent of one year's service charge or $250.00, whichever sum is the greater, and that the provisions of this paragraph shall apply if loss or damage, irrespective of cause or origin, results, directly or indirectly to persons or property from performance or nonperformance of obligations imposed by this Agreement or from negligence, active or otherwise, of Rollins, its agents or employees."

On November 30, 1981, a fire occurred at Corral's residence causing an estimated $185,631.30 damage. Appellant claimed that the fire alarm system failed to relay an alarm to the defendant's central receiving station, which resulted in a delay in the summoning of firefighters. Corral claimed that the damage to his residence and personal belongings was much worse than would have occurred if the fire alarm system had functioned properly.

## NEGLIGENCE AND STRICT LIABILITY

Corral alleged that Rollins' negligence in failing to exercise reasonable care in the installation and maintenance of the alarm system resulted in the destruction of his home. He also sought to recover from Rollins based upon the theory of strict liability. The trial court held that the provisions of the agreement limited Corral's recovery under these theories to the sum of $250. It is plaintiff's position that the trial court erred by enforcing the limitation of damages clause, and in not finding the clause violated public policy.

It is the traditional rule, followed in Kansas, that mentally competent parties may make contracts on their own terms and fashion their own remedies where they are not illegal, contrary to public policy, or obtained by fraud, mistake, overreaching, or duress. *Belger Cartage Serv., Inc. v. Holland Constr. Co.*, 224 Kan. 320, 327, 582 P.2d 1111 (1978); *Kansas City Structural Steel Co. v. L. G. Barcus & Sons, Inc.*, 217 Kan. 88, 535 P.2d 419 (1975); *Kansas Power & Light Co. v. Mobil Oil Co.*, 198 Kan. 556, 426 P.2d 60 (1967). A party who has fairly and voluntarily entered into such a contract is bound thereby, notwithstanding it was unwise or disadvantageous to him. *Wille v. Southwestern Bell Tel. Co.*, 219 Kan. 755, 757, 549 P.2d 903 (1976). However, an exception to this principle of freedom of contract has been recognized when a contract is so one-sided that it is found to be

unconscionable. *Wille v. Southwestern Bell Tel. Co.*, 219 Kan. 757.

Although this court has not previously dealt with the validity and enforceability of provisions limiting damages in contracts involving fire and/or burglar alarm systems, the vast majority of cases from our sister states dealing with the issue upholds such provisions. See generally Annot., Burglary-Fire Alarm Malfunction Liability, 37 A.L.R.4th 47; and Annot., Validity, Construction, and Effect of Limited Liability or Stipulated Damages Clause in Fire or Burglar Alarm Service Contracts, 42 A.L.R.2d 591, and cases cited therein.

In *Atkinson v. Pacific Fire Extinguisher Co.*, 40 Cal. 2d 192, 253 P.2d 18 (1953), the defendant had agreed to install and maintain a fire detection system in plaintiff's business. Subsequently, a fire erupted on the premises, no alarm was sounded, and plaintiff's building was destroyed. A provision in the parties' contract limited the defendant's liability to the sum of $25. In the litigation that followed the fire, plaintiff received judgment in the amount of $97,000. On appeal the court upheld the liability limiting provisions and plaintiff's award was reduced to the liquidated sum of $25. The court reasoned that damage was likely to take place if a fire occurred even if the alarm functioned properly and that arriving at the damage caused by the failure of the alarm to function was bound to be very speculative. In addition, the court noted that for the small fee the defendant received it should not be placed in the position of being a fire insurer of plaintiff's property. See *American District Telegraph Co. v. Roberts & Son*, 219 Ala. 595, 122 So. 837 (1929); *Scott & Fetzer v. Montgomery Ward*, 112 Ill. 2d 378, 493 N.E.2d 1022 (1986); *Abel Holding Co. v. American Dist. Telegraph Co.*, 138 N.J. Super. 137, 350 A.2d 292 (1975), *aff'd* 147 N.J. Super. 263, 371 A.2d 111 (1977); *Appliance Associates v. Dyce-Lymen Sprinkler*, 123 App. Div. 2d 512, 507 N.Y.S. 2d 104 (1986). In *Fireman's Fund Ins. Co. v. Morse Signal Devices*, 151 Cal. App. 3d 681, 198 Cal. Rptr. 756 (1984), the court appeared to accept the rule from *Atkinson*, except it indicated that clauses limiting damages would not be upheld where gross negligence by the alarm company was found.

In at least one case, *Antical Chemicals, Inc. v. Westinghouse*,

*Etc.*, 86 App. Div. 2d 768, 448 N.Y.S.2d 279 (1982), a contract clause was enforced to prevent any recovery against the alarm company. The facts in *Antical Chemicals* are very similar to those at bar. The plaintiff claimed that the defendant's alarm system failed to transmit a fire alarm to the defendant's central communication center and consequently the communication center did not contact the fire department and damages were sustained to plaintiff's warehouse. The defendant's agreement with plaintiff contained a disclaimer of responsibility for communications failures. The court granted defendant Westinghouse's motion for partial summary judgment on the grounds any recovery was barred by the disclaimer contained in the contract.

The precise clause at issue in the present case was found to be valid in *Gill v. Rollins Protective Services Co.*, 722 F.2d 55 (4th Cir. 1983). In *Gill* a residential fire occurred, no alarm was reported by defendant's system, and the customer's home was totally destroyed. One of the issues presented in the case was whether the installer and maintainer of a fire-burglary protection system could contractually exempt itself from liability for negligence. The court reviewed existing Virginia law and determined that parties on equal footing may contractually limit their liability for ordinary negligence. However, the case was remanded for a new trial based upon the Virginia Consumer Protection Act, as will be more fully discussed later in this opinion.

In *Kansas City Structural Steel Co. v. L. G. Barcus & Sons, Inc.*, 217 Kan. at 95, the court stated:

"The policy of the law in general is to permit mentally competent parties to arrange their own contracts and fashion their own remedies where no fraud or overreaching is practiced. Contracts freely arrived at and fairly made are favorites of the law. (*Kansas Power & Light Co. v. Mobil Oil Co.*, 198 Kan. 556, 426 P.2d 60.) None of the parties here involved were neophytes or babes in the brambles of the business world. Both companies, it would appear, dealt in projects involving considerable sums of money; both operated substantial business enterprises; and there is no suggestion that their businesses were not capably managed and profitably operated. The trial court did not find the limitation on damages imposed by the exculpatory clause was unconscionable, and we cannot view it as such. The limitation imposed was not total and was agreed upon by parties standing on equal footing."

There is no contention here that Corral was at any business disadvantage or that he did not or could not understand the clear

terms of the contract. Also, there does not appear to be any contention that the agreement was obtained by Rollins through fraud, mistake, or duress. Neither is there any contention that Rollins was guilty of any gross or wanton negligence or intentional misconduct which resulted in the failure of the alarm system. The limitation of liability clause is not contrary to public policy and the district court did not err in finding it valid as to the claims based upon negligence and strict liability and limiting Rollins' liability thereunder.

## EXPRESS WARRANTY

Appellant contends that the trial court erred in sustaining Rollins' motion for summary judgment on his theory of breach of an express warranty. It is the position of Corral that certain statements and directions in the operating instructions furnished by Rollins constituted an express warranty that "in the event of a fire when the alarm is in the delayed position, a telephone communicator will notify the Rollins Central Emergency Center which, in turn, will notify the fire department."

Rollins, on the other hand, contended that as there was no sale of goods there could be no warranty, express or implied, because the Uniform Commercial Code, K.S.A. 84-2-101 *et seq.*, (UCC) applies only to sales. The trial court concluded that the UCC applied, that there could be no warranties outside the terms of the UCC, and, therefore, there were no warranties in this transaction. We agree that the agreement here did not involve a sale and that the UCC is limited to sales. However, the trial court was in error, as will be shown in more detail later, when it concluded there could be no warranties unless the transaction constituted a sale subject to the UCC. Warranties, express or implied, may be present in any type of contract including sales, leases, bailments, service agreements, and others. The question here is not whether there was a warranty under the UCC, but whether Rollins made any express warranties to Corral which induced him to enter into the contract. While it is true that most of the reported cases involving warranties are sales cases, warranties are by no means limited to sales.

*Adrian v. Elmer*, 178 Kan. 242, 284 P.2d 599 (1955), was an action based upon the sale of a bull purchased for breeding

purposes. It was alleged that the bull turned out to be "almost entirely barren, impotent and unfit for the purposes for which he was purchased." The court, in defining an express warranty, held:

"In order to constitute an express warranty, no particular language is necessary. It need not be in writing or be made in specific terms, and the word 'warrant' or 'warranty' need not be used." Syl. ¶ 1.

"Any direct and positive affirmation of a matter of fact, as distinguished from a mere matter of opinion or judgment, made by seller during sale negotiations and as part of the contract, designed or intended by seller to induce buyer to buy, and actually relied upon by buyer in buying, is a 'warranty.' " Syl. ¶ 2.

In *Naaf v. Griffitts*, 201 Kan. 64, 439 P.2d 83 (1968), an action for breach of an express warranty in a sales transaction, the court held:

"An express warranty is created by any direct and positive affirmation of fact made by the seller concerning the article to be sold during sale negotiations and as part of the contract upon which the seller intends the buyer to rely in making the purchase." Syl. ¶ 1.

In 67A Am. Jur. 2d, Sales § 690, the distinction between "express" and "implied" warranties is stated as:

"Express warranties are those for which the buyer bargained; they go to the essence of the bargain, being a part of its basis, and are contractual, having been created during the bargaining process. Implied warranties arise by operation of law and not by agreement of the parties, their purpose being to protect the buyer from loss where merchandise, though not violating an express promise, fails to conform to the normal commercial standard or meet the buyer's known particular purpose." pp. 46-47.

It is clear that for there to be an express warranty there must be an explicit statement, written or oral, by the party to be bound prior to or contemporaneous with the execution of the contract. The operating manual here does not rise to the status of an express warranty. The manual is clearly instructional and advises the homeowner how to properly activate the protective system upon leaving the premises and how to deactivate it upon reentry. Statements in the operating instructions relied upon by appellant merely state what is expected to happen when the operating controls are set in a particular manner, that is, when the alarm system is activated. Those statements do not constitute warranties as to the system's performance and there is no assertion that

such statements were part of the inducement for the agreement. There is nothing in the agreement itself which even approaches an express warranty.

We conclude the trial judge did not commit error in granting summary judgment to Rollins on the claim of a breach of express warranty, albeit he did so for the wrong reason.

## MAGNUSON-MOSS WARRANTY ACT

On September 26, 1985, Corral filed a second amended petition in which he alleged an additional cause of action asserting a violation of the federal Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.* (1982). Following a motion for summary judgment by Rollins, the trial court granted summary judgment on the basis that in the absence of a sale there were no warranties that were protected by the Act. We agree.

The Magnuson-Moss Warranty Act was passed by Congress in 1975 and applies to the *sale* of consumer products manufactured after July 4, 1975. The Act sets forth three purposes for its enactment: (1) improving the adequacy of information available to consumers, (2) preventing deception of consumers, and (3) stimulating competition in the marketing of consumer products. 15 U.S.C. § 2302(a). The reasoning that underlies these purposes is: (1) Better informed consumers will make better judgments about how to spend their dollars; (2) consumers who have greater advance knowledge about the warranties that accompany goods will select those products that have stronger warranties; (3) as consumers begin to select goods based upon warranties, manufacturers and sellers will be induced to compete on warranty terms; (4) this will provide better warranty protection to consumers and conceivably better product quality since strong warranties will not accompany weak goods. Reitz, *Consumer Protection Under the Magnuson-Moss Warranty Act*, 1978 ALI-ABA Comm. on Cont. Prof. Educ. 23.

Rollins maintains that the Act is inapplicable, and relies upon language found in the definitional section of the law which refers only to sales transactions. A "consumer" is described as a *buyer* of any consumer product, *i.e.*, personal property used for personal, family, or household purposes. 15 U.S.C. § 2301(1) and (3). The critical aspects of the law, "written warranty" and

"implied warranty," are defined in 15 U.S.C. § 2301(6) and (7) respectively.

"The term 'written warranty' means:

(A) any written affirmation of fact or written promise made *in connection with the sale of a consumer product by a supplier to a buyer* which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or

(B) any undertaking in writing *in connection with the sale by a supplier of a consumer product* to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking."

"The term 'implied warranty' means an implied warranty arising under State law . . . *in connection with the sale by a supplier of a consumer product.*" (Emphasis added.)

Warranties on services are not covered under the Act. 16 C.F.R. § 700.1(h) (1986). Also, the Act does not apply to leases of consumer products since a "written warranty" under the Act only arises in connection with the "sale" of a consumer product. 15 U.S.C. § 2301(6). Thus, the Act literally covers only warranties on a consumer product "sold" to a consumer. Clark and Smith, The Law of Product Warranties, ¶ 15.08 (1986 Supp.).

*Corral* seeks to rely on a few cases from other jurisdictions which have applied the Act to transactions which were not clearly sales. In *Henderson v. Benson-Hartman Motors, Inc.*, 41 U.C.C. Rep. Serv. 782 (Callaghan, 1985), the court extended the Act to an automobile lease which "had most of the characteristics of a sale." The court found that the lease in question closely resembled an installment sales agreement in that:

"This lease agreement extends for most of the useful life of the automobile. The payments due under the lease agreement may be almost equal to the full purchase price, with interest, of the automobile under a four year installment sales agreement. Also, unlike typical lease agreements, the responsibility for maintaining the automobile rests with the lessee, taxes are to be paid by the lessee, the lessee must obtain insurance, and in the event of default, the lessee pays the remaining installments and receives a credit for the proceeds from the sale of the automobile." 41 U.C.C. Rep. Serv. at 783-84.

Based upon its finding that the lease should be treated as a sale, the court held it was subject to the Act.

In *Freeman v. Hubco Leasing, Inc.*, 253 Ga. 698, 324 S.E.2d 462 (1985), the plaintiff leased a DeLorean sports car from the

defendant. The lease called for forty-eight monthly payments and then a final lump sum payment at the end of the lease, after which the plaintiff would own the car. Under Georgia law, such a transaction was viewed as a sale and the court, having found an installment sale contract rather than a lease, held the Act applied.

Another case applying the Act to a lease transaction is *Business Modeling v. GMC*, 123 Misc. 2d 605, 474 N.Y.S. 2d 258 (1984), where the lessee of an automobile was allowed to proceed against the lessor under the terms of the Act. The court determined the lessee was a consumer and ignored all other provisions of the Act which clearly limit it to sales.

All of the cases which we have found which apply the Act to transactions which are not clearly sales are readily distinguishable from the facts now before the court. The agreement here, whether it be denominated a lease, a service agreement, or a lease/service agreement, has none of the characteristics of a sale and is clearly not subject to the terms of the act. The trial court was correct in granting summary judgment to Rollins on the claim of a violation of the Magnuson-Moss Warranty Act.

## IMPLIED WARRANTY

Corral asserted a cause of action based upon a breach of the implied warranties of merchantability and fitness for a particular purpose. The trial court held that as there was no sale there could be no implied warranty under the UCC.

A "warranty" may be generally defined as an assurance by one party to a contract of the existence of a fact upon which the other contracting party may rely, but which is collateral to the main purpose of the contract. 17A C.J.S., Contracts § 342. A warranty may be either express, as set forth in the contract, or implied under the circumstances of the case. While it is true that warranty actions involving the sale of goods are dealt with pursuant to the terms of the UCC, the creation of warranties is not confined to cases arising out of sale transactions. In Kansas it is recognized that a person who contracts to perform work or to render service, without an express warranty, impliedly warrants to perform the task in a workmanlike manner and to exercise reasonable care in doing the work. *Tamarac Dev. Co. v. Dela-*

*mater, Freund & Assocs.*, 234 Kan. 618, 622, 675 P.2d 361 (1984); *Gilley v. Farmer*, 207 Kan. 536, 485 P.2d 1284 (1971); *Scott v. Strickland*, 10 Kan.App. 2d 14, 691 P.2d 45 (1984); *Crabb v. Swindler, Administratrix*, 184 Kan. 501, 337 P.2d 986 (1959). In *Crabb* we held:

"When a party binds himself by contract to do a work or perform a service, in the absence of an express agreement, there is an implied agreement or warranty, which the law annexes to the contract, that he will do a workmanlike job and will use reasonable and appropriate care and skill." Syl. ¶ 2.

*Gilley v. Farmer*, 207 Kan. 536, was an action against an insurance carrier for failure to properly handle a claim. The court stated:

"[T]his court has been consistent in holding that where a person contracts to perform work or to render a service, without express warranty, the law will imply an undertaking or contract on his part to do the job in a workmanlike manner and to exercise reasonable care in doing the work. (*Crabb v. Swindler, Administratrix*, 184 Kan. 501, 337 P.2d 986.)

"Where negligence on the part of the contractor results in a breach of the implied warranty, the breach may be tortious in origin, but it also gives rise to a cause of action *ex contractu*. An action in tort may likewise be available to the contractee and he may proceed against the contractor either in tort or in contract; or he may proceed on both theories." p. 542.

Another illustration of an implied warranty outside a sales transaction exists in the law of bailments. Under the common law, an implied warranty of fitness exists in connection with bailments made for the mutual benefit of the parties. 63 Am. Jur. 2d, Products Liability § 199. This implied warranty of fitness for intended purpose was discussed in *Global Tank Trailer Sales v. Textilana-Nease, Inc.*, 209 Kan. 314, 496 P.2d 1292 (1972):

"An implied warranty of fitness has been recognized in connection with bailments made for the mutual benefit of the parties. The rule is that if a bailment is for the mutual benefit of both the bailor and the bailee, such as a let-for-hire agreement, then a higher duty arises on the part of the bailor, the general rule being that, while the bailor is not an absolute insurer against injuries from a defective chattel, he is charged with the duty of inspection to determine whether or not the chattel is fit for the purpose intended. Thus, if the defect were discoverable, he became liable for injuries to the bailee, arising from this unsafe condition, under the theory of an implied warranty of fitness." p. 320.

The court has also recognized that implied warranties may exist in lease transactions. See *Stephens v. McGuire*, 184 Kan. 46, 334 P.2d 363 (1959), and *Hohmann v. Jones*, 146 Kan. 578, 72 P.2d 971 (1937).

The trial court was in error when it concluded that there could be no implied warranties outside the ambit of the UCC. We agree that the UCC only applies to sales but that does not preclude the application of common-law or statutory implied warranties to transactions which are not sales and clearly are not controlled by the UCC. Here, the trial court found that the parties had entered into an "installation and service agreement." Additionally, there is no contention by Rollins that the $250.00 limitation of liability clause applies. Rollins states in its brief:

"The Service Agreement itself never mentions the word warranty. The limitation of liability clause merely limits the damages available in actions based on theories such as negligence and strict liability. . . . Clearly, the Service Agreement itself does not attempt to limit remedies for a breach of implied warranty."

Summary judgment on the claim of breach of implied warranty must be reversed.

## KANSAS CONSUMER PROTECTION ACT

The next issue raised by Corral is that the trial court improperly entered judgment on his claim for violation of the Kansas Consumer Protection Act, K.S.A. 50-623 *et seq.* (KCPA).

In his Memorandum Decision in this case, the trial judge rejected Corral's claimed violation of the KCPA, stating:

"5. Plaintiff's claim for relief based upon a violation of the Kansas Consumer [Protection] Act is based upon an alleged violation of K.S.A. 50-639[a](2) and (e) improperly limiting the warranties and remedies available for breaches thereof. In order for the plaintiff to prevail on this argument he must first prove that such warranties would be imposed by law. Those warranties would be imposed only by the Uniform Commercial Code. It imposes no such warranties upon the type of contract entered into by the parties. K.S.A. 50-369 provides that nothing in the section shall be construed to expand the implied warranty of merchantability as defined in K.S.A. 84-2-314 to involve obligations in excess of those which are appropriate to the property. Since there [were] no implied warranties imposed by law there can be no violation of the Kansas Consumer Protection Act. However, it should be noted that the Service Agreement does not attempt to limit the existence of an implied warranty of merchantability of fitness for a particular service. It does not attempt to limit the remedy of such warranty. The limitation of liability clause, contained in the Agreement between the parties simply limits the damages available in actions based on theories such as negligence and strict liability. Clearly, the Agreement between the parties does not attempt to limit remedies for a breach of implied warranty. Accordingly, the Court holds that plaintiff's claim for relief based upon a violation of the Kansas Consumer Protection Act does not state facts sufficient to constitute a claim for relief."

Having already determined that the agreement in this case is not subject to or controlled by the UCC, the trial court's holding to the contrary is clearly erroneous.

Rollins seizes upon isolated language by Professor Barkley Clark in *The New Kansas Consumer Legislation*, 42 J.B.A.K. 147 (1973). Quotations are taken out of context and run together in appellee's brief as if one continuous statement. A careful reading of the article makes it clear that Professor Clark did not contend that passage of the UCC eliminated all warranties except in the law of sales.

Corral clearly asserted a cause of action for violation of K.S.A. 50-639(a)(2) and (e). K.S.A. 50-624 defines certain words and terms used in the KCPA as follows:

"(b) 'Consumer' means an individual who seeks or acquires property or services for personal, family, household, business or agricultural purposes.

"(c) 'Consumer transaction' means a sale, lease, assignment or other disposition for value of property or services within this state (except insurance contracts regulated under state law) to a consumer or a solicitation by a supplier with respect to any of these dispositions.

. . . .

"(h) 'Services' includes:

(1) Work, labor and other personal services;

. . . .

(3) any other act performed for a consumer by a supplier.

"(i) 'Supplier' means a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the original course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer."

## K.S.A. 50-639 provides in part:

"(a) Notwithstanding any other provisions of law, with respect to property which is the subject of or is intended to become the subject of a consumer transaction in this state, no supplier shall:

(1) Exclude, modify or otherwise attempt to limit the implied warranties of merchantability and fitness for particular purpose; or

(2) exclude, modify or attempt to limit any remedy provided by law, including the measure of damages available, for a breach of implied warranty of merchantability and fitness for a particular purpose.

. . . .

"(c) A supplier may limit the supplier's implied warranty of merchantability and fitness for a particular purpose with respect to a defect or defects in the property only if the supplier establishes that the consumer had knowl-

edge of the defect or defects, which became the basis of the bargain between the parties. In neither case shall such limitation apply to liability for personal injury nor property damage.

. . . .

"(e) A disclaimer or limitation in violation of this section is void."

In addition to his claims under K.S.A. 50-639, Corral also asserts he is claiming under K.S.A. 50-627 in that the agreement constituted an unconscionable act or practice under the statute. K.S.A. 50-627(b) sets forth several specific actions which the court must consider in determining whether an act is unconscionable. Rollins, on the other hand, argues that the allegation of unconscionability was never properly before, nor presented to, the trial court. The record is confusing.

The original petition in this case, filed September 28, 1983, made no claims of any unconscionable acts by Rollins and made no reference to K.S.A. 50-627. On October 5, 1983, a "First Amended Petition" was filed, however, nothing in it referred to unconscionability. As this amended petition was filed prior to any responsive pleading of Rollins, it was timely and properly filed. K.S.A. 60-215(a). On May 1, 1985, another petition entitled "Plaintiff's First Amended Petition" was filed which contained the allegation:

"28. That the installation service agreement entered into by the parties contains a limitation of liability clause which constitutes an unconscionable act and practice pursuant to K.S.A. 50-627."

No order approving the filing of this amended petition appears in the record before this court and Rollins' counsel did not consent to its filing. See K.S.A. 60-215(a). Thereafter, on September 26, 1985, a "Second Amended Petition" was filed in which "the plaintiff adopts and incorporates all allegations set forth in his First Amended Petition." The petition then proceeded to state, for the first time, a claim under the Magnuson-Moss Warranty Act. The filing of this petition was approved by an order of the court filed October 14, 1985. That order referred to "plaintiff's Motion for an order allowing plaintiff to file a Second Amended Petition incorporating the original Petition and the First Amended Petition." We have no way of determining which "First Amended Petition" the trial court intended to be included in the "Second Amended Petition" and therefore we leave it to

the trial court to determine, on remand, whether plaintiff may proceed under K.S.A. 50-627 for an alleged unconscionable act or practice.

As indicated earlier in this opinion, the general rule is that contractual agreements limiting liability are valid if fairly and knowingly entered into and if not in violation of other provisions of law. However, none of the cases cited by either party involve the application of state consumer protection laws. Our research has disclosed only one similar case which does involve such a statute and, as fate would have it, that case was against Rollins Protective Services Co., our appellee, and involved what appears to have been an identical agreement. In *Gill v. Rollins Protective Services Co.*, 722 F.2d 55 (4th Cir. 1983), the plaintiff entered into a contract for a fire and burglary alarm system, evidently similar to the one in this case. A fire occurred at Gill's home, the alarm failed and Gill suffered extensive damage to real and personal property. An action was filed against Rollins on theories of common-law negligence and violation of the Virginia Consumer Protection Act. Va. Code § 59.1-196 *et seq.* (1982).

Following a trial to a jury, the case was submitted on both theories propounded by the plaintiff without any special questions or special verdict. The jury returned a general verdict for plaintiff for $238,032.78 and Rollins appealed. As pointed out earlier, the court first recognized the validity of the limited liability provision of the contract and that damages for negligence were limited thereunder to $250.00. However, as to the alleged violations of the Virginia Consumer Protection Act, the court stated:

"The limiting provision in the Rollins contract does not in terms attempt to limit Rollins' liability for violations of the Virginia Consumer Protection Act. Because of that, and especially in view of the rule that such limitations of liability are not favored and are strictly construed, see *Fairfax Gas & Supply Co. v. Hadary*, 151 F.2d 939, 940 (4th Cir. 1945) (diversity case arising under Virginia law), we do not read such a limitation into the contract, even if it be valid and enforceable. *Cf.* Restatement (Second) of Contracts §§ 179, 195. The contractual agreement between the parties, therefore, is not a defense to, and does not limit any liability for, damages under the Virginia Consumer Protection Act.

. . . .

"As before discussed, under the statutory theory of recovery, Mrs. Gill may recover her damages regardless of the limitation clause in the contract, while

upon the negligence theory her damages may be limited to $250. Because we cannot say which theory was the basis of the jury's verdict, the judgment must be vacated and the case remanded for a new trial. [Citations omitted.] Upon a new trial, we suggest that separate verdicts, as to negligence on the one hand and the statutory cause of action on the other, are appropriate." pp. 58-59.

We conclude the trial court erred in granting summary judgment upon the claim of an alleged violation of the KCPA.

We are not unmindful of the impact this decision may have upon firms such as Rollins, which are attempting to provide a useful, and in many cases, essential service to the public at a reasonable cost. Alarm companies should not be held to be insurers of the property of their customers for the nominal fees they charge for their services. However, it is not for this court to create exceptions to our consumer protection act which are not clearly contained therein. K.S.A. 50-623 requires that the act be liberally construed to, among other things, "protect consumers from unbargained for warranty disclaimers" and "to protect consumers from suppliers who commit deceptive and unconscionable practices." If alarm companies are to be excepted from the provisions of the Act, such must be done by the legislature and not by the courts.

The judgment of the trial court granting summary judgment upon Corral's claims of breach of implied warranty and violation of the Kansas Consumer Protection Act is reversed; the judgment granting summary judgment and partial summary judgment on the other claims is sustained and the case is remanded for further proceedings.